Our fourth case for this morning is Rebecca Gysan, individually and as executor of the estate of Shane Cattling, her son. Back on November 23rd, 2013, there was a tragic incident where Mr. Cattling was shot and killed after a traffic stop occurred on the side of the road, and he was taken to the hospital. We filed an action on behalf of the estate for a wrongful seizure and ultimately use of a deadly force. The lower court, we filed a motion for summary judgment based on the second stop that was an initial traffic stop or initial stop to determine how Mr. Cattling was doing when he was parked on the side of the road. There was a secondary stop that was initiated by Mr. Officer Francisco subsequent to that. We filed a motion for summary judgment, which was denied by the lower court. The appellee had filed a cross motion for summary judgment, and the lower court granted that motion for summary judgment, indicating that that stop was illegal. Counsel, can I ask you some questions about the stop? Not the first stop, the second stop that's on appeal. So, justification. Let's assume that we agree with you that there was no reasonable suspicion or probable cause on the drug stuff. That this is an emergency aid stop, so a subset of exigent circumstances. And the question is whether there was an objectively reasonable basis to think that Mr. Cattling might have needed aid. This is what I'm struggling with. So we haven't applied that in the context of automobiles. We've applied that in the context of houses, and one has a lesser expectation of privacy in an automobile than one does in one's home. And he had made a 911 call, which, you know, 911 calls are answered, what's your emergency? I mean, so he has represented to the 911 dispatcher, and I've listened to the calls, that he's in trouble, he might be disappearing soon, etc. Can you articulate for me why that would not fall within the emergency aid exception? I mean, what's a little bit troubling in the automobile context is that if someone makes a 911 call seeking assistance and they're in a home, the police can knock on the door and you can say, you know, if you're Mr. Cattling, actually, no, I'm fine now, and then that's that. In a car, you know, it's a bit more of a dramatic stop, but in a situation where you have a reduced expectation of privacy. So can you articulate for me why that would not have fit within the emergency aid exception? In looking at the record, it was clear that that was not the case here. Yeah, but subjective motivations don't matter. We have to ask from the perspective of an objective. Was there an objectively reasonable basis for thinking that he might have needed emergency aid? Well, I don't believe there was because Officer Francisco previously had met with Mr. Cattling in the initial stop, spoke to Mr. Cattling, let him go. There was no evidence of any type of illness or anything like that other than this, quote, cryptic call that was made to 911. But then thereafter, if you listen to the tapes, the officers discuss how, well, we have no reason to stop him. There was no—I can't think of— I agree with you. I agree with you. But even if it was pretextual, right, that's not the question. The question is was there—would another officer, would a reasonable officer, would an objectively reasonable officer have thought that someone who made a 911 call, agitated saying he might be disappearing soon, is it objectively unreasonable under the Fourth Amendment to stop that person to see if they're okay? I think it is. And, again, when you look at the record and the conversations that took place when they did stop him, they didn't ask him, are you okay? And, again, I'm not saying that this was pretextual, but the evidence shows that, in fact, there was no concern about his safety at all. This was not a reason to stop him. This was— At the time of the second stop, and let's just, I guess, unless otherwise indicated, we're talking about the second stop. The first—I agree, the first word out of their mouth doesn't seem to be, are you okay? But they're just starting the conversation before these abrupt events of the U-turn and all the rest of it unfold. And it's very difficult in a situation like this where the decision to make the wellness stop seems to be so clearly not their real reason for being interested in him. But the law of the land is Wren, and the law of the land is that these pretextual stops do not offend the Fourth Amendment because it's an objective standard, not a subjective standard. And, you know, his comments are somewhat weird to the 9-11 operator. It doesn't strike me as completely beyond the boundaries for the operator to think, you know, this guy isn't, you know, or I don't have anything to say. I mean, there are any number of things he might have said. No, he calls 9-11, maybe because he's nervous around police officers, for all I know. But all they have is the objective facts to go on, and then they try to make the call, maybe because he's on the line with his mother, I don't know, but they don't get through to him. And that's when the dispatch operator says, well, you could do a wellness check. And they think, good, you know, because he's not violating the traffic laws. I'm going to put the fog line off to one side because that seems to be manufactured. But when they actually stop him, the suggestion is wellness check, and we don't get too far in the conversation before things go badly. Well, we don't get too far in the conversation because they immediately open up his door and try to gain entry into the car. Right, they open up the door and they're talking to him. And then they tell him. Turn your car off. Turn your car off. Turn over the keys. Get out of the car. Right. That's a seizure. If you're entitled to make a stop on the road, you're entitled, the Supreme Court has held, to direct the person to get out of the car, there's no doubt that this is a seizure. There's some question whether there's adequate cause for it. I have a somewhat different question about this second stop. Is the estate claiming that the second stop is an independent source of damages, that is, independent of what happens later? Is the estate? I'm not sure I understand. The estate. Oh, it's the estate. I'm sorry. Contending that the second stop is a source of damages independent of what happens later. Well, any seizure, again, ultimate try or effect, whether it be a jury or a judgment. You can answer my question yes or no, and then you can explain why. And can I just say, I think you're asking, are you looking for some kind of damages just from the indignity of being stopped the second time, as opposed to damages for the consequences 10 seconds later when, of course. I will be clear about the reason I'm asking this question. It's the holding of the Supreme Court in Los Angeles against Mendez, which her brief doesn't discuss. The Ninth Circuit once concluded that if the police, by doing something wrong, set up a situation that then leads to a violent encounter, they can be liable even if they behave properly during the violent encounter. Mendez rejects that rule and says that even if police misconduct leads later to a violent encounter, the police are entitled to behave just as if there had been no misconduct. Much of the argument that I see from you seems to be the second stop was in the chain of causation, and if you knock it out, therefore there is liability for the later shooting. That line of argument would be right if we were in an exclusionary rule case, but under Mendez, it's not right in a damages case. And so I'm trying to figure out whether there are, whether you are seeking damages just for the stop independent of the shooting. We are. And what are those damages? I believe there's an independent… What are those damages suffered by the estate? The indignity of being stopped, being ordered out of your vehicle, being fearful of your… Is this a survivable claim? Right. Mr. Catiline is not the plaintiff. Correct. This is a claim by an estate, and normally we think of the claim by an estate as a claim for the loss, you know, lost future income of the estate to the extent the plaintiff is suing as a relative for loss of companionship. That doesn't come from the stop. That comes from the shooting. I'm trying to figure out what loss is attributable to the stop, given the fact that Catiline is not here to say I suffered humiliation. I think his own actions would be testimony to the indignities of being stopped. Would the cause of action that he had be something of value that was within the estate? Is that the answer to Judge Easterbrook? Like that was his property. He could have brought that cause of action and recovered something, and so now it's properly part of the estate? Right. So if things had unfolded differently, if they had stopped him, pulled him out of the car, he's insulted, he's frightened, he's whatever, but instead of backing up, you know, it just ends. Then I suppose he would have had a cause of action, a claim against the officers. For all I know, it would have been nominal damages, a dollar, but he would have had some kind of claim, so the estate would have been enriched to the extent of whatever those damages were. Now, if it turned out that he was an unusually vulnerable person and he was suffering from psychological illnesses and it pushed him over the line into a lifelong of psychological care, maybe the estate would have had more. That all strikes me as quite speculative, but I'm just trying to say, suppose this had all ended the way I'm sure the police officers originally thought it was going to end, either with a search of the car after the dog came or with saying, sorry, you know, we've bothered you enough now, go on to your job or whatever. So that's the hypothetical that we're trying to think of. Well, to be honest with you, Your Honor, I have not thought that all the way through. I believe that the independent stop is an independent cause of action that the estate would have on behalf of Shane Cattling, because as a result of what they did, he acted in a certain manner, which again was somewhat reckless, and we'll admit that. But that stop itself caused him some damages. I have not thought what Justice Easterbrook has said regarding- We are judges. Judges, I'm sorry, Your Honor. Where that would lie damage-wise. Okay. So we believe that the lower court determined that this was a wellness check and clearly determined it was a wellness check, and we do not believe that it is a wellness check. So you have to argue that there was really not even enough from the objective point of view in this record to justify a wellness check, much less a wellness check in a car. I think that's where Judge Barrett was starting out. Because the officer says in the audio that I have no reason to stop him, there's no reason, and then we have arguably a non-law enforcement dispatcher who says, well- But you keep sliding into the subjective. Let's assume that we accept that it was pretext, which based on those tapes, it certainly seems to have been a pretext. But remember, the test is objective. I understand. So imagine you had two officers who are acting in good faith and were really concerned about his health. Would they have had an objectively reasonable basis for stopping him to check on his health? I don't believe that there is enough there. The evidence is just the things he says to the 911 operator. They seem to perceive that he was tired during the first stop because there's the suggestion maybe you should go to a hotel if you're tired and find a safe place to sleep. There's some interchange about that. And then you've got the peculiar statements in the 911 call. So is that enough to support a wellness check? No, I think the lower court took a bunch of those facts and created some inferences from those facts to support the non-movement argument. So the lower court granted the motion for summary judgment. Subsequent to that, Shane Catiline, as I've indicated, acted in a reckless manner by trying to elude the police, pulling away. He collided with the other squad car, and Officer Francisco then jumped on the car and within a matter of seconds shot Mr. Catiline five times. We believe that that force was excessive or at the least it should be a determination by the trier of fact. There was no reason. There's a question of fact whether Officer Kuehl was actually even in the zone of danger. And when you look at the pictures that are submitted in the briefs, I can't even imagine where he might have been. There's a witness who said— That's pretty dangerous conduct. I contend it was not an attack, but it was a collision that occurred as he was driving off the road. They had to jump out of the way because the door was open, and then he started reversing. And I've watched the video. You know, all you can hear is Kuehl screaming, like, I'm hurt, I'm hurt. And we have to—whether or not he was in fact pinned, we are judging it based on what Francisco could have reasonably perceived in that moment, right? It's not 20-20. So you hear him screaming. He hasn't taken his foot off of the pedal. And the question is, in the split second of the moment, did he perceive there to be danger to Kuehl or to other drivers on the road? Well, there's no evidence of any other drivers on the road. The one driver who was on the road— He was on I-88. I mean, he was on the highway. People zip down I-88. Right. Maybe even more than 70 miles an hour. But that doesn't mean you get to just shoot a vehicle. They're trying to elude the police. Yeah. I mean, in this case, the car was off the road, almost towards into a ditch, embedded into another vehicle. There's a witness who says that Officer Kuehl was not even in the zone of danger, if you want to call it the zone of danger. But there's this video, too. I mean, not every—people overuse Scott v. Harris, in my opinion. But in this instance, this video shows Officer Kuehl limping away. I mean, he's—he would have to be a very good actor to be faking that. That's after the fact, Judge, and there's no evidence that he was injured at all. Whether he— Really? There's no real evidence of any injury. Is he a member of Actors' Equity? Yeah. Okay, well, I'm going to give you another minute, but you're over already on your time, so we'll move on. And we believe that the force that was used in shooting Mr. Catalina five times, when the car was embedded, the car was off the road. Okay, we understand the point. It was not going into traffic, and we believe that that force was excessive and was unreasonable and was not necessary at the time. Okay. All right. Thank you. That will conclude this part. Mr. Sheffield. Good morning, Your Honors. May it please the Court. Jonathan Sheffield representing the appellees. This Court should affirm the entry of summary judgment on both of the Plaintiff's Fourth Amendment claims. The undisputed and irrefutable facts show that the traffic stop and force used were reasonable as a matter of law. So can we just focus? I try to kind of create a list of what would have supported a finding of a need for a wellness check based on the evidence here. So it can't just be you called 911. Maybe you called 911 because you're fine, but you see somebody robbing a house down the street. I mean, all kinds of reasons. But then he tells the operator, I am in a lot of trouble right now. He says, I think I'm going to be disappearing. And then Francisco hears him, this is all in the first stop, say, for reasons that Francisco would have no idea, and I certainly don't either, this isn't going to end well. And then Francisco does seem to think he's tired. Now, I would place no weight on Catalin's refusal of permission to search the car. People are entirely entitled to do that if that's what they want. Your Honor, the State agrees that the refusal to consent to search of the car is not factored into the totality of the circumstances that warrant a stop for emergency purposes. In addition to the facts that you mentioned, the 911 call and the troubling statements in that call, the dispatcher tried to call Catalin again and thus avoid having a seizure at all, if he had pulled over voluntarily to answer the call. But he may have been on the phone. I mean, I'm sure you've experienced some little beep because somebody else is trying to call through because you're on the phone with somebody else. I typically ignore them. And I haven't, you know, 911 hasn't tried to call me, but I assume it doesn't show the number. I don't answer the phone if it's an undisclosed number, a number I don't recognize. Right. The State isn't arguing that Catalin should have picked up the call, but the circumstances are that there's no answer, so there's no expounding upon those statements in the first 911 call. So they're still in whatever state of uncertainty they're in. So on they drive, on they drive for some time. I don't know whether it's 10 minutes. I'm not sure I know where that estimate comes from. But they certainly drive for quite a while. And your opponent makes the point, which seems to me commonsensical, that if they really were all that worried about his wellness, why do you wait and wait and wait to see if he's committing a traffic offense? That seems to undermine any finding of an objective reason to think that there's something wrong with him. He's driving for some number of minutes. Your Honor, the officers waiting and attempting to find legal justification for the stop, looking for probable cause at first and then deciding on a wellness. They could have stopped him right away on wellness if they really thought that the combination of things they learned from the first stop amounts to an objective concern for his wellness. Yeah, the emergency aid doctrine doesn't depend upon the passage of time, but whether the emergency is still existing at the time that the officers stop him. And there's no clarification of his statements that I'm in a lot of trouble and I might be disappearing soon over the course of the minutes that the officers followed him. But Mr. Sheffield, they find it. So it's true that when Francisco talks to him during the first stop, he doesn't know about the 911 call. But the 911 call had already happened or happened partway through that stop. But the fact of the matter was he had observed Mr. Catiline after the call was made. So he'd already had an opportunity to see. And he said he was tired, but he had an opportunity to see him, and it didn't seem like he was in great distress. So it's not a situation where the police find out about a 911 call and they have had no opportunity yet to check the person out. So he had the opportunity to check the person out. And as Chief Judge Wood is saying, while the subjective intentions don't matter, I think the fact that they didn't act on this wellness concern right away is certainly some evidence that an objective officer may not have perceived a need for urgent. Well, that's right. That focuses on the exigency aspect of the wellness checks. You don't just sort of randomly pull people over on Interstate 88 to make sure they're feeling well. You know, we need some evidence that there's a real problem before you do that. Right. And the officers know that 10 minutes or less is not anywhere. It's a very small amount of time that Mr. Catiline would be on the road that day. By the time the officers caught up to him driving back to Ohio, which would be hours away. And so they had time to observe him as he drove back that direction. Perfectly. We're below the speed limit. I mean, there was nothing that would have fueled their concern based on the way he was driving. Right. And the officers, to be clear, Officer Francisco wasn't the one who asked about the wellness check. It's not clear that he was aware that that was a possibility until Trooper Kuehl radioed and asked about that. And then the dispatchers. Well, actually, I didn't even think that's what happened. I thought that what happens is in response to the 911 call, the dispatcher gets in touch with local officers, Kuehl in this instance. And as luck would have it, you know, they're the same people who had just seen it. But that struck me as almost accidental. And then it's the dispatcher. You know, he says, oh, we're trying to get probable cause, but we can't come up with anything. And the dispatcher says, oh, well, how about trying wellness? You know, which is a pretty disturbing sequence. Judge Wood, the dispatch calls contain the dispatcher's call to the officers asking if they're still with Catalina. Yeah, exactly. That's what I mean. But they've reached out to this team of people because the 911 people are trying to follow up when they can't get Mr. Catalina back on the phone, right? Right. But at that time, the dispatcher doesn't suggest a basis for the stop. The officers suggest that they'll look for probable cause. And the first time a wellness check is brought up is Trooper Kuehl radioing the dispatch and asking about that. And the dispatcher confirming, yes, based on the 911 statement, it's a wellness check. And then Trooper Kuehl takes the lead and performs the stop. So, but again, the circumstances indicating the stop are an emergency call, troubling statements. And even if those don't amount to a violation, which the state does argue that they do, it's not clearly established that this is a violation of the Fourth Amendment because the appellant has provided no controlling authority that, in these circumstances, an emergency stop is unconstitutional. Mr. Sheffield, let me give you a hypothetical. Let's imagine that I'm driving and I call 911 and say, I'm really not feeling well. You know, I didn't take a medication, a blood pressure medication, you know, that I needed today. I'm not feeling well. And then hang up. I don't respond to a call back because I don't want to stop my car and I don't want to answer the phone while driving. Then do the police, could they, under the emergency aid exception, pull me over? Your Honor, that's a very different circumstance. Saying I'm not feeling well is different from saying I'm in a lot of trouble might be disappearing. I would have thought your answer would have been yes. Sorry, I don't understand your reaction. Well, I would have thought that your position here is that if someone makes a 911 call, self-identifying as someone who might be in immediate need of assistance, that that gave the police the probable cause they needed under the exigent circumstances doctrine to pull someone over. I apologize, Judge Barrett. I didn't realize from your statement that it was apparent that the driver would be in a need of immediate assistance based on saying I don't feel that well. But I think that it would at least be debatable whether or not officers could stop that person to ask them a few follow-up questions to make sure that they weren't just overreacting on the phone call. And that's essentially what the officers were trying to do here. So I want to go back to the sequence. It's on page 9 of your brief where it's recounting the conversation between the dispatcher. They're worried about the dog and so on. And Francisco is saying he's not going to be speeding or doing anything wrong, blah, blah, blah. We'll stay with him. Then Coole asks the dispatcher about performing a stop based on the 911 call, saying, did you get my message? And then it's the dispatcher. I really, it's not Coole. The dispatcher says, yes, due to the fact that he did call 911 to check on a welfare check. And Coole says 10-4 will be making a stop then. I mean, that sounds to me like the state is arguing for a flat rule that anyone who calls 911 can be stopped on a welfare check. No, Your Honor, that's not the state's argument. The state is arguing that because the officers also observed that he was, he appeared to be fatigued. Officer Francisco even suggested that he get some sleep and knew that the circumstances were unusual. He said he was driving long distance, had only a red bag. That's unusual on I-88? No, Your Honor, but that he only had a red bag, but also the 911 call is a very important factor in this. But it's not the only factor. I do see that my time is running short. I do want to make sure that I answer any of your questions that pertain to the excessive force claim. The state's, just to begin, the appellate said that there's no evidence of other drivers on the road and there's no evidence that Trooper Coole was injured. It's undisputed that Trooper Coole had hip injuries. Do we know the mile marker or rough position on the highway where this happened? Your Honor, we might. I think we know that it was near mile marker 35, I believe. I apologize, I don't remember the exact number. But I did try to figure out, based on the record, how long the drive was, how long, and where this happened. I'm thinking of something different. There are places, I've driven I-88 more times than I care to think. And there are places on the road where it just sort of stretches endlessly off into the west or east or whatever, either direction. And there are places on the road where it's somewhat curvy. It's not a particularly mountainous part of the country, needless to say. It's quite flat. But you might not have a visual ability to see who's coming beyond a certain distance. And so I was just thinking that even though the record seems to show that there were no cars right at that instant that would have encountered this reckless move that he makes, if people are driving 75 or 80 miles an hour, they could come around a curve pretty quickly. So I just don't know what the layout of the road is at the place this happened. Your Honor, I haven't been able to ascertain whether there's any curves. But I can say that the video shows as the traffic stop is occurring, other cars driving past. And then immediately after the incident, the trucker drives by. This court held early in this year that drivers and pedestrians and cyclists within 20 minutes of an area are endangered by a driver who is driving erratically and essentially posing a danger to others. So how close are the other drivers? That hasn't been briefed, but at the very least, there are other drivers who are. Well, just the perception that there's a risk, that even though I can't see somebody right now, they could come whooshing around a curve and there they'll be. I see, Your Honor, yes. That's what I was, from the police officer's point of view, I was thinking a rational police officer might have that concern unless the road is straight for the next 60 miles and sometimes you have a lot of visibility on these roads. But it is the trucker's testimony that, first of all, Officer Francisco did see the semi-truck, and it is the trucker's testimony that he had stopped traffic behind him. So there isn't any evidence that Francisco, if he did see any other vehicles, couldn't conclude that other motorists were at risk. Mr. Sheffield, I'm trying to figure out how this could have ended differently for Mr. Catalin. You know, once he reversed and spun the car around and hit the police car, did Francisco, I gather, didn't give him a warning? No, Your Honor. Just shot, and there's some dispute about this autopsy report and the possibility that he may have had his arms up in surrender. Do you want to talk about the autopsy report? Yes, Your Honor. First, the appellant relied on the autopsy report even though it was excluded from evidence at summary judgment. You know, I think that's wrong, actually, because at summary judgment, it's very common, for example, to have deposition testimony, things that if you reached a trial, then you would get the right authentication and you would overcome the hearsay problem. You would, for the deposition, maybe you just call the person, you come for an autopsy report, you call the person who prepared the report. So it seemed to me that it was a little precipitous to say, I mean, it certainly is hearsay, but a lot of hearsay is curable at the trial. Yes, Your Honor. Again, the court's decision is reviewed for an abuse of discretion, assuming that that would be. Mr. Catalin, even if he had his hands raised, in the instance where Officer Kuehl could hear Luke Kuehl screaming and saw the van's engine revving or heard the van's engine revving and knew the person was screaming. But he never even talks to him. I mean, suppose, for example, I don't know what happened. Suppose Mr. Catalin, after these maneuvers, had a broken spine, you know, and wasn't going to go anywhere, you know, because he's going to be a quadriplegic the rest of his life. There's no, any communication. Your Honor, it's just like blast first, think later. Your Honor, it's the State's position that even though the issue hasn't been briefed, the appellant didn't argue that a warning was necessary by citing cases and discussing that issue and developing an argument on that, that a warning here would have been infeasible because the window was up, the car, the van's engine was revving very loud, and the, I mean, the timing was six seconds between impact and first shot. That's disturbing, though. In our society, it means you're going to be shot first before anybody bothers to find out what's happening. I realize the airbags had deployed, too. It's not clear to me what line of sight Officer Francisco had. Maybe he just saw some giant airbag deployed and just figured let's just shoot into the airbag. You know, I don't know. Well, again, under even the truck driver's testimony, Officer Trooper Kuehl is in front of the van as its engine is revving and wheels are spinning. And so time is of the essence here, and courts give leeway to officers in these circumstances. You know, even if this wasn't the perfect decision, the question is whether it was reasonable to conclude that there was a serious danger to Trooper Kuehl in these circumstances. I see, I saw the minute, sorry. No, you don't, actually. You're into your extra minute. Thank you. So why don't you wrap up here? Your Honors, if the court has no further questions, the appellee's remaining arguments are in the brief, and this court should affirm the judgment. Okay, thank you. And I promised you one more minute if you need it, Mr. Koulos. Thank you, Your Honor. We believe that the record shows that the truck driver, Sean Dale, indicated that Trooper Kuehl was not in front of the van. He was behind, right at the rear of the squad car, nowhere anywhere near the zone of danger. We believe that the lower court cherry-picked certain facts, took them in a light most favorable to the non-movement, and adopted their arguments with support of those facts. Counsel indicated that there was no case that we showed that was right on point regarding the second stop, but we don't have to show anything on all fours to substantiate our position in this matter. We believe that, based on the record, we believe that there's a bunch of disputed facts that should be determined by the trier of fact, not in a motion for summary judgment. We believe that we've sustained our burden proving that the second stop was unlawful, and we believe that in regards to the use of force, that should be a question for the jury to decide. All right. Thank you very much, then. Thanks to both counsel. The court will take the case under advisement.